[Civ. No. 899.    Third Appellate District—July 31, 1911.]

## J. B. HICKS, Petitioner, v. M. J. DESMOND, as City Clerk of City of Sacramento, Respondent.

PRIMARY ELECTION — NOMINATIONS FOR TRUSTEES OF CITY OF SACRAMENTO—CONSTRUCTION OF CHARTER.—Under the charter of the city of Sacramento the trustees thereof, though required to be residents of the ward which each one especially represents, are required by the terms of the charter to be elected by the vote of the qualified electors of the whole city; and the nomination of such trustees, under the premiary election law, may be properly made by the electors of the city at large belonging to the party which nominates them.

ID.—MEANING OF WORD "REPRESENTS."—The use of the word "represents" in the charter, as applied to the ward in which each trustee resides, is not intended to make the boundaries of each ward to mark the same as the political subdivision in which each candidate is to be held in nomination, but is intended merely to describe the qualifications which a citizen must possess to make him eligible to the office of trustee.

ID.—OBJECT OF DIVIDING CITY INTO WARDS.—The object of dividing the city into wards is solely for the purpose of selecting members of the legislative body, so as to establish a scheme of equal representation in matters of local concern in the board of trustees, for the various wards of the city, peculiarly affecting their welfare, and not for the purpose of limiting their territorial authority as members of the board of trustees elected by the voters of the city at large.

ID.—PROVISION FOR PRIMARY ELECTIONS OF TRUSTEES NOT REQUIRED IN CHARTER—PRIMARY ELECTION LAW APPLICABLE.—No provision for a primary election for trustees of the city is required to be inserted in the charter, which controls as to the qualification and election of the city trustees; but the primary election law controls as to the nomination of trustees who are to be elected in the city at large.

ID.—PURPOSE OF CHARTER PROVISION AS TO MODE OF ELECTION AT LARGE —ELECTION DISTRICT—NOMINATIONS AT LARGE.—The purpose of the charter provision making the election of trustees by the city at large was to establish the city at large as an election district for all the essential purposes of an election of the public trustees of the city, including the nominations of the trustees under the primary election law by the voters of the city at large, in such election district.

ID.—DESIGN OF PRIMARY ELECTION LAW TO PROTECT PARTY NOMINATIONS.—The design of the primary election law is to protect nominations by party organizations within party lines.

ID.—MANDAMUS TO PROTECT PARTY NOMINATIONS AT LARGE.—The writ of mandate will lie to compel the city clerk of the city of Sacramento to file nominations made under the primary election law by the voters of the party making such nominations in the city at large.

APPLICATION for writ of mandate to the city clerk of the City of Sacramento.

The facts are stated in the opinion of the court.

Hugh B. Bradford, and Clinton E. White, for Petitioner.

J. R. Hughes, for Respondent.

HART, J.—This is an original application for a writ of mandate to compel the respondent to file the nomination papers of petitioner as a candidate for the office of member of the board of trustees of the city of Sacramento for the third ward of said city.

The respondent has interposed a general demurrer to the petition, and thus the question to be determined is presented.

The single proposition submitted for decision by this proceeding is whether the nomination of a candidate for the office of trustee of said city shall be made only by such electors belonging to the political party of which such candidate is a member as reside within the limits of the ward of which such

candidate is a resident or by all the electors of the entire city that are members of such candidate's political party.

This question arises upon conflicting constructions of the meaning and intent of an amendment of section 8 of the charter of the city of Sacramento which was, at the general municipal election held in said city in the month of November, 1909, submitted to and ratified by the electors of said city and approved by the legislature of 1911.

Said amendment, in so far as it is of interest to this inquiry, reads as follows: "The board of trustees shall consist of nine (9) members, one member from each ward, and he shall be a resident of such ward. The trustee from each ward shall be elected by the qualified voters of the city and each such elector shall be entitled to vote on the election of each trustee."

It will be observed that said amendment, while expressly providing that candidates for the office of trustee shall be voted for by all the voters of the city, makes no specific provision as to the manner in which such candidates shall be nominated by the several political parties. It is, therefore, contended by the respondent that nominations for trustee of said city must be made in accordance with the requirements of subdivision 6 of section 5 of the primary act of 1911, and that, under the terms of said subdivision of said section, properly construed, such nominations must be made by wards.

Section 5, subdivision 6, of the primary act of 1911 (Bancroft's ed., Stats. 1911, p. 775) provides: "Except in the case of a candidate for nomination to a judicial office or a school office, nomination papers shall be signed as follows: by not less than one per centum and not more than two per centum of the voters of the party of the candidate seeking nomination within the state or *political subdivision thereof in which said candidate seeks nomination.*" (Italics ours.)

The argument of respondent is founded on his construction of section 7 of the charter of said city, which reads as follows: "The legislative power of the city of Sacramento shall be vested in a board of trustees, who shall hold office for the term of four years, subject to the exception stated in the next section. Each member of the board of trustees shall be a qualified elector at least twenty-five years of age, and shall have been a citizen of this state, and an inhabitant of the city, for

at least three years, *and of the ward which he represents* for at least one year next before the day of his election.''

The contention of the corporation counsel, representing the respondent herein, is that said section of said charter contemplates that a trustee shall be selected to specially *represent* the *ward* for which he is elected and that he represents the city at large only in the discharge of a duty incidental to such office, and that thus it was intended that the boundaries of such ward should mark ''the political subdivision of the state in which said candidate seeks nomination.'' From this construction of said section 7 it is argued that, since that section was a part of the city charter at the times that the amendment of section 8 of said charter was proposed to the voters and ratified by them, it is to be presumed that, in proposing and ratifying said amendment, it was so proposed and ratified with the terms of section 7 in mind, and that if it was intended that a different rule should be followed in the nomination of a trustee from that contended for by the respondent, ''a provision would have been inserted in said section 8 providing that trustees shall be nominated and elected by the electors of the city instead of being silent upon that matter.''

The position of the respondent, it will be noted, is planted largely upon the meaning of the word ''represents,'' as it is employed in section 7 of the charter; but we are of the opinion that he gives the word as so used a different or much more restricted signification than it was intended by the framers of the charter to imply. It appears to our minds quite manifest that, to construe section 7 of the charter as respondent understands its meaning, the significance of the phrase as used in that section, ''and of the ward which he *represents*,'' must be held to lie in an intention or a purpose of the framers of the charter to thus fix and limit the duties and official jurisdiction of a member of the board of trustees so that he is thereby intended to be and in contemplation of said section is a mere *district* or *ward* rather than a *city* official. The section is, in our judgment, incapable of such a construction.

It appears to us to be very clear, from the language of section 7, that the sole purpose of the provisions thereof is simply to prescribe the qualifications which a citizen must possess

to render him eligible to membership of the board of trustees. There is nothing in the language of said section from which it may be implied that there was any intention to thereby prescribe or limit the duties of a member of the board of trustees. The obvious purpose of the framers of the charter in subdividing the municipality into districts or wards and providing that the members constituting the governing or legislative body of said municipal government should be selected by wards was to establish a scheme, fashioned after the plan of the legislative districts of the state, by which each portion of the city so divided and designated, would thus receive as nearly as might be equal representation in matters of local legislation or regulation. In other words, the sole object in dividing the city into wards for the purpose of selecting members of the legislative body of the municipality was, manifestly, to prevent the happening of the contingency, possible under a scheme by which trustees could be selected regardless of the location of their voting residences, of the selection of all the members of the board of trustees from one or perhaps two portions of the city, whereby other portions of the city might not have, in practical effect, that *special* representation in the matters of local legislation essential to the full and complete safeguarding of those interests peculiarly affecting their welfare. It is, therefore, very clear that the word "represents" in section 7 was used, not for the purpose of defining the power or prescribing the duties or of limiting in any degree the territorial authority of a member of the board of trustees, but, as before suggested, was therein employed solely for the purpose of declaring or defining one of the several qualifications of eligibility to membership of said board—that is, to designate the period of time during which a citizen must have resided within the ward for which he may seek election to the office of trustee before, in that respect, he is eligible to exercise the duties of that office.

Nor do we perceive any merit in the argument that, had it been intended by the amendment of section 8 that candidates for the office of trustee should be nominated by the voters at large of the political parties to which such candidates may, respectively, belong, a provision expressly authorizing such manner of nomination would and should have been inserted in said amendment. At the time of the framing and the

ratification of said amendment it was provided by the general primary election law that "for any officer *voted for entirely within one city* . . . " the nomination papers should be signed "by at least three per centum of the party vote in at least one-fourth of all the election precincts within the district *in which the officer is to be voted for.* . . . " (Subd. D of subd. 5 of sec. 5, Primary Election Law, [Stats. 1909, p. 695].) Thus it will be observed that when the amendment was framed and submitted to and ratified by the voters of the city of Sacramento there was no necessity for inserting in said amendment a provision expressly requiring the nomination for trustee to be made by the voters of the candidate's party in the city at large. The effect of the ratification and approval of the amendment was, by virtue of the provision of the primary act as it then existed, to require the nominations for that office to be made by the voters throughout the entire city. Indeed, at the time the amendment was framed, submitted and ratified, the incorporation therein of a provision of that character would obviously have been regarded as supererogatory, since the general law of the state upon that subject had itself already provided that where the candidate was to be voted for within the city by the voters at large, his nomination should likewise be made by the voters at large belonging to the political party to which he belongs, and, therefore, the silence of the amendment in that regard was doubtless *ex industria* and very properly so. It thus becomes very clear, we think, that the purpose of the amendment and the intention of the voters in ratifying the same was to establish the city at large as *an election* district for each trustee for all the essential purposes of an election to public office under the general laws by the provisions of which only may a citizen present his aspirations to the voters to serve the public in an official capacity. In other words, in view of the provisions of subdivision D of subdivision 5 of section 5 of the primary election law, as said provisions read prior to their amendment by the legislature of 1911, it seems to us that no proposition could be farther removed from the realm of disputation than that the purpose in the minds of the framers of the amendment of section 8 of the charter and the scope and effect thereof as it was ratified by the voters were to require a candidate for trustee to not only submit his can-

didacy as a nominee of his party for such office to the voters
of the city at large, but, in order to secure the nomination
for that office from the party of which he is a member, to
first submit his candidacy for such nomination to those elec-
tors of the city at large that belong to or are members of his
political party. We find nothing in the primary act, as it
was amended by the legislature of 1911, inconsistent with the
construction thus placed upon the amendment of section 8
of said charter. As stated, said amendment, aided by subdi-
vision D of subdivision 5 of section 5 of the act of 1909, fixed
the boundaries of the city as the boundaries of the election
district for trustee, and such district could not be changed
except by express language or by language or a scheme so
plainly inconsistent therewith as to effect a change by neces-
sary implication. In other words, the provision in the act
of 1909 is, in effect, that where the officer is to be voted for
within the city—that is, voted for by the voters of the city
at large—the nomination must be made by the voters in the
city at large belonging to the party of the candidate, while
the provision of the later act is merely that the nomination
is to be made by the voters belonging to the candidate's party
"within the political subdivision in which the candidate seeks
nomination." It is, therefore, to be at once perceived that
the provision in the act of 1911 does not, either expressly or
by implication, repeal the effect of the former provision
which, with the amendment of the charter in question, estab-
lished the city as the election district for trustee; for the
political subdivision (referred to by the provision of the
later act) in which the candidate for that position "seeks
nomination" is the subdivision which had theretofore been
established in the manner suggested. If the provision in the
act of 1911 declared that the candidate should secure to his
nomination papers the specified number of signatures from
the voters of his party within the district or subdivision which
he was to be elected to *specially represent,* or used other lan-
guage of like import in that regard, then, obviously, a dif-
ferent proposition would be submitted, for in such case it
could perhaps be said to appear reasonably clear that the
intention was to change the election district for said office,
so far as it concerned the nomination. But no such proposi-
tion is presented here, and, as stated, the language of the pro-

vision of the act of 1911 cannot, by any rational construction, be held to have changed the election district or the boundaries thereof for· the nomination for the office of trustee of said city.

It may with no impropriety be added that, if the construction given the amendment of the charter by respondent is to be adopted, it may readily be seen how the fulfillment of its obvious object could easily be circumvented. It will not, of course, be denied that the ultimate object sought to be attained by the amendment was to give to the voters of the city at large, rather than to confine the exercise of that right to the immeasurably smaller number of voters residing within each of the wards, the privilege of having something to say upon the most important question that can concern the administration of the affairs of a municipal government, viz.: The right to take part in the selection of those officers upon whom is bestowed almost the entire legislative and administrative power of such a government—those officers, indeed, constituting the legislative body of the city, to whom is committed the all-important power of levying taxes upon the property of the citizen and of disbursing the public revenues, of adopting or rejecting regulations designed to promote and conserve public morals and public health, and, in short, of exercising a variety of powers directly affecting the personal and property rights of the inhabitants of the community embraced within the municipal jurisdiction. Most certainly it could not be said that the voters of the city at large were vested with the full measure of power in that regard if the amendment in question may be so construed as to restrict them in the right to express their preferences for trustees to the mere act of voting at the general election for one of the candidates nominated for that office by a small percentage of the voters residing within a ward, since it would still be in the power of the voters of such ward, if they chose to do so, to so manipulate the nominations by the political parties as that individuals would thus be presented to the voters at large as candidates for that office who would not be, by reason of unfitness, in point of both character and ability, the choice of the voters of the city at large. In other words, if the construction of the scope of the amendment as respondent understands it is correct, the

voters at large would be compelled to select either the one or the other of two or three nominees, neither of whom possessed the first qualification for the performance of so responsible and important public duties. Thus it is clear that the amendment, if construed in harmony with respondent's contention, might, and perhaps would, in many instances, result in conferring upon the voters of the city at large no greater or better advantages, in respect of the election of trustees, than they enjoyed prior to the adoption of the amendment. Nor, as has been suggested, would it be a reply to this proposition to say that, in the supposititious case, the voters of the city at large could secure relief by casting aside party lines and so proceed to select some capable and trustworthy citizen as a candidate, independently of a political party nomination for the office, or, having that course open to them, that it could, therefore, well be maintained that the object of the amendment in question was not to clothe them with the right to participate in the nominations for trustee. For the policies and principles of our governments in this country, as is and has been immemorially true in other and older countries than this, have always, as a general rule, been worked out and crystallized into practical facts through the instrumentality of political parties which have thus become an essential part of our institutions. Indeed, in this state at the present time, as has been true for many years past, we have a positive or legislative recognition of these political partisan organizations in the laws regulating the methods of conducting primary elections or elections prosecuted within party lines. And most unquestionably it is not in accordance with the intent or the spirit of the primary law or any local regulation framed in pursuance thereof to so hamper the rights of electors who, from a conviction of principle, have identified themselves with a political party, as to drive them from their party in order that they may be permitted to select men of fitness in all respects to represent them in the public service. On the contrary, the central purpose of recent legislation is to give to the voter full opportunity to express himself fully and *effectively* with regard to the men who shall be selected to stand as the nominees of the political party to whose principles and policies he conceives it to be his duty as a loyal supporter of

good government to pledge his allegiance. Besides, common experience justifies the declaration that, as a rule, a majority of the members of a political party are disposed to religiously and often blindly adhere to party lines and so ''stick to the ticket,'' notwithstanding that conditions may, for the sake of good government, imperatively demand an abandonment of party in the selection of public officials. But it is not necessary to further pursue an investigation for reasons, apart from those which are apparent on the face of the amendment in question itself, viewed by the light of the provision of the primary act of 1909 to which we have referred, disclosing that the object of said amendment of section 8 of the charter of Sacramento was to give the voters of that city at large the right to nominate as well as to elect trustees. It is, as we have declared, clear to us that such was the object of the amendment and that it was fully accomplished.

For the reasons stated herein, the demurrer to the petition was heretofore overruled and the prayer for a writ of mandate granted.

Chipman, P. J., and Burnett, J., concurred.